256 N.J. Super. 1 (1992)
606 A.2d 378
JOHN SCOTT SEELEY, PLAINTIFF-RESPONDENT,
v.
CINCINNATI SHAPER COMPANY, LTD., CINCINNATI, INC. (FORMERLY CINCINNATI SHAPER CO. OF CINCINNATI, OHIO), DAVID SCHWARTZ COMPANY, AND FAB SALES, DEFENDANTS-APPELLANTS AND RUTHERFORD COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1991.
Decided February 14, 1992.
Reconsidered April 8, 1992.
Decided May 5, 1992.
*2 Before Judges KING, DREIER and BROCHIN.
*3 James D. Martin argued the cause for appellant Cincinnati Shaper Co., Ltd. (Lynch, Martin & Philibosian, attorneys; Kenneth R. Russell, on the brief).
Michael Goss, admitted pro hac vice, argued the cause for appellants David Schwartz Machinery Co., Inc. and FAB Sales, Inc. (Weinstein, Goss, Katzenstein, Schleifer & Eisenberg, attorneys; Nancy J. Winkler, on the brief).
Michael J. Barrett argued the cause for respondent John Scott Seeley (Wilentz, Goldman & Spitzer, attorneys; Michael J. Barrett, on the brief).
James H. Keale argued the cause for respondent Rutherford Corp. (McCarter & English, attorneys; James H. Keale, on the letter brief).
The opinion of the court was delivered by DREIER, J.A.D.
This appeal focuses upon a manufacturer's continuing duty to warn a remote owner or user of its product concerning safety problems inherent in the product, but either not recognized or not acted upon by the owner.
Defendant Cincinnati, Inc., the successor to Cincinnati Shaper Co., Ltd. (the Scottish manufacturer of the machine that injured plaintiff), appeals from a $500,000 judgment based upon its failure to warn of the dangers of operating a 225-ton press brake without a point of operation guard. Plaintiff had also alleged that the machine was defective when manufactured because it did not incorporate the type of universal guard proposed by plaintiff's expert, but the jury rejected this theory and held defendant liable solely for its failure to warn. Other codefendants were interim owners or sellers of the machine from the time of manufacture through the time of purchase by *4 plaintiff's employer.[1] After issuing our initial opinion of February 14, 1992, we granted the parties' cross-motion for reconsideration and invited additional briefing. We have incorporated our responses to their arguments in this revised opinion.
On April 28, 1987, plaintiff John Scott Seeley was injured while operating a press brake on the premises of his employer, East Atlantic Manufacturing Company. Mr. Dominick LeoGrande was a part owner of East Atlantic and was responsible for its day-to-day operations. He had hired plaintiff who was then 18 years old and had graduated one year earlier from a vocational high school where he had been trained as a machinist. On the day of the accident LeoGrande assigned plaintiff to work on the press brake, after he had been given only 15 minutes of training on the machine.
The machine is used to fabricate metal by compressing it between two dies, an upper die attached to a ram and lower die attached to the bed of the machine. The ram and bed are several feet long. Although East Atlantic used the press brake to fabricate hollow metal door frames, the machine has a wide variety of uses. It can form, punch, notch, sheer or bend metal in many different ways. Depending upon the size and configuration of the dies, the machine can operate on both small parts and large pieces of metal, one example given being the fabrication of helicopter blades or other products of considerable length. For this reason the machine was originally designed to accommodate a variety of point of operation guards. When originally manufactured by Cincinnati, the machine was intended to accommodate a J. Broughton Radio-Visor Photoelectric Guard. As originally designed and manufactured in 1966, the *5 machine not only accepted such a guard, but was inoperable without it. The press brake was shipped by its Scottish manufacturer on July 30, 1966 to its English customer; the guard was installed; and the press brake was operating that day.
There is no question that the machine had been substantially altered between the original sale by Cincinnati and its eventual purchase by East Atlantic. The drive, clutch and brake assemblies had been replaced, and the mechanical foot treadle used to activate the machine had been replaced by an electric pedal. The original treadle required an operator to raise his foot and exert considerable pressure before the machine could be activated. The electric pedal requires but a light touch to start the machine; when the pressure is released on the pedal, the machine stops. The electric pedal usually was supplied with a cover or shroud so that the operator would be forced to insert his foot to press the pedal. This would prevent either his accidentally triggering the machine or the machine being triggered by some falling object. There was some suggestion that the replacement of the treadle with the electric foot pedal was a material change in the machine. However, the material supplied to East Atlantic by Cincinnati contained references to such an electric pedal and, therefore, a jury could have found that this mode of activation would reasonably have been expected by Cincinnati. See Finnegan v. Havir Mfg. Corp., 60 N.J. 413, 423, 290 A.2d 286 (1972). There was evidence, however, that when an electric pedal such as this is used, it should never be placed close enough to the machine so that the operator could activate the machine by means of the pedal while his hand could be between the ram and the bed.
The accident occurred here when plaintiff inserted a metal sheet to be shaped by the machine. For some reason the metal sheet was not stopped by a rear plate or guide that normally would have caused the sheet to have been positioned correctly. Plaintiff reached into the machine to pull the sheet back towards him and most probably stepped on the electric pedal at *6 the same time. Perhaps because of the operator's lack of experience and training, and perhaps because of the absence of the safety shroud which should have covered the pedal and prevented such an occurrence, the machine activated and the ram caught plaintiff's hand between the dies, severing it at the palm. The hand was reconnected after micro-surgery, but movement has been only partially restored, and a portion of plaintiff's hand is now fused into a fixed semi-closed position.
Cincinnati's predecessor, the manufacturer, kept records concerning each of its products. In the early years after its initial sale, this press brake was serviced on 13 occasions, and at least one of the service records specifically noted that the photoelectric guard was working properly. After 1970, however, defendant received no further requests for maintenance and lost touch with the machine. Apparently, however, the photoelectric guard was removed at some point, and there is no evidence of how long it had remained in place, why it was removed, or by whom. At some point the machine was purchased by a British company, Phoenix Machinery Company Ltd. Phoenix in turn sold it to defendants Schwartz Machinery and FAB Sales who later brought the machine to the United States and sold it to defendant Rutherford Company, which finally sold it to East Atlantic. When East Atlantic purchased the machine in October 1986, it had no guard protecting the space between the jaws of the machine (a "point of operation guard").
After the purchase, Mr. LeoGrande contacted defendant Cincinnati and requested an owner's manual and parts manual for the press brake. The response letter from Cincinnati, Inc., located in Cincinnati, Ohio, is informative. The company did not merely send the requested parts manual and operations manual. Defendant obviously was concerned with safety. Its letter was addressed to East Atlantic's safety department and stated:
Gentlemen:
Through your recent transaction with our Parts and/or Service Departments, we have learned that you now have a CINCINNATI machine. In an effort to *7 help you with this equipment and your safety program, we are writing to offer our assistance.
It is possible that since this machine was manufactured, the safety standards have changed and that you now have a machine which requires updating to meet these standards. CINCINNATI INCORPORATED can help by providing a quotation for updating and by providing training materials for your operators which cover safe operating methods and procedures.
Please review the enclosed bulletin, PI-30641[2] and advise us on how we might be of help.
 Very truly yours,
 CINCINNATI INCORPORATED
 Ralph W. Wellington
 Manager  Product Safety
While obviously trying to sell its services, Cincinnati clearly informed East Atlantic that the machine might need a safety check and enclosed extensive safety materials.
Plaintiff's theory of this case was first that there was a design defect in that there was no built-in universal guard to be used with all of the machine's operations. Given the variety of uses to which this machine may be put, the expert testimony that no one photoelectric or mechanical guard could have accommodated all of the anticipated uses of the machine, and the lack of an appeal from this aspect of the jury's determination, we need not dwell upon the jury's initial verdict that the failure to have installed a universal guard such as the one suggested by plaintiff's expert did not constitute a design defect. The question of defendant's liability is solely dependent upon plaintiff's second theory of liability, a failure to warn, and this in turn is dependent upon our review of the materials forwarded to East Atlantic, and a later visit by Mr. Gary Remlinger, a *8 Cincinnati service representative, on November 21, 1986, five months prior to the accident.
Plaintiff's expert contended that the employer should have been clearly told that the machine should not be operated without a point of operation guard,[3] and further that the machine itself should have been posted with a similar warning to the operator. We have examined the materials that were sent to East Atlantic and that were introduced into evidence. Furthermore, we requested at oral argument and have received a specific list of the references to safety guards within these extensive materials.
In addition to the owner's manual and parts manual, Cincinnati sent to East Atlantic: (1) its publication entitled "Press Brake Safeguarding," (2) three safety signs to be posted on the machine, and (3) the American National Standards Institute ("ANSI") regulations. In these materials the following appear:
1. There is definite statement that if a particular emblem does not appear showing compliance with the ANSI safety *9 standards, the safety of the press brake should be updated. It notes that the machine is "very likely" to be in violation of the standards. Specifically, East Atlantic was informed that Cincinnati could provide "special point of operation safeguarding information for press brakes." Further, the employer is told that "safeguarding the point of operation is the responsibility of the employer in accordance with OSHA and ANSI B11.3-1982."
2. The safety explanations for the employee specifically call attention to the ANSI regulations and to the fact that the employer should "evaluate each press brake operation in order to determine the method of point of operation safeguarding which best meets that operation," with a reference to the ANSI regulation. Furthermore, the operator of the machine was to be informed by the employer to review the Safety and Operators Manual and not to operate the machine until doing so.
3. Throughout the manual there are warnings that the operator should not place his hands into the point of operation, and additional warnings such as: "Use the point of operation safeguarding selected, or method of operation selected to minimize the exposure to the potential hazards at the point of operation." The employer again is warned to "[e]valuate each operation to determine the point of operation safeguarding to be used."
4. Suggested safety signs are supplied and explained in the safety manual. The employer is specifically instructed to provide point of operation safeguarding.
5. The required safety maintenance check included a check that the point of operation safeguard was operating properly, and that appropriate point of operation safeguarding had been used for the particular set-up.
6. The Operator's Manual asks the operator to check that "adequate safeguarding [is] available and used."
7. The operating instructions note that as part of the daily start-up procedure there should be a check "that all required *10 safety devices are operating properly and all safety procedures are being used."
8. The same suggestion is made in the section of the Operation Manual concerning bending.
9. One of the signs supplied for attachment to the press brake states clearly that the employee should "use point of operation safeguarding," and that the set-up procedure include admonitions to "provide point of operation safeguarding" and to test the safeguarding before the operation starts.
10. Another sign suggested within the ANSI standards for the machine states "NEVER operate this machine without adequate safeguarding."
11. The ANSI standard concerning bending states clearly that the final component in the process is "the safeguarding means ... the last but most important component necessary."
12. The ANSI regulations (supplied to the employer) in section 6.1.3 state that it is the employer's responsibility "to establish, monitor, and enforce appropriate rules for safe operation of power press brake operating procedures; for example... (2) To enforce strictly the use of safeguarding provisions provided for a particular piece-part operation."
There are at least ten more references to point of operation guards, even to the point of giving a point of operation selection chart for the types of guards, depending upon the particular operation, and pictorial description of available guards, all contained within the ANSI standards supplied to the employer. Mr. LeoGrande obviously had not read this material. He testified that punch presses generally had safety devices, but press brakes did not. He stated that until this accident, if anyone had told him to operate the press brake with a safety device, he would have laughed at them.[4]
*11 Approximately a month after East Atlantic's request for the manuals, Cincinnati sent a service representative, Mr. Gary Remlinger, to visit East Atlantic. Remlinger's primary duties were to repair Cincinnati machinery and set up new machinery built and shipped by his employer. He obviously also attempted to sell additional machinery or services, since he testified that his calls would on some occasions result in such sales. When he viewed the machine purchased by East Atlantic, he informed the company and noted in his service report that he could not service the machine because it had been altered by the replacement of the original drive assembly, clutch and brake. Furthermore, the original foot treadle had been replaced.[5] Remlinger's total comments in his November 25, 1986 report of the November 21st visit indicated that he had met with Dominick LeoGrande for a "G.W. No. Chg." (presumably "good will, no charge") service visit. Under the report sheet topic "conditions found and services performed," Remlinger stated:
G.W. at request of branch  new account  pressbrake has been converted to air clutch & brake of a nonCincinnati design  advised customer that service on *12 clutch or brake would have to be done by manufacturer of clutch & brake  left lube sheet and answered customer questions.
Remlinger also noted that the job was complete and that safety tags had been installed.[6] He spent one hour on this visit.
The trial judge gave the jury extensive charges concerning both design defects and warning defects. Unfortunately, the 1987 Products Liability Act, L. 1987, c. 197, N.J.S.A. 2A:58C-1 et seq., apparently was not recognized as governing this action. See Tirrell v. Navistar Int'l, Inc., 248 N.J. Super. 390, 398, 591 A.2d 643 (App.Div. 1991), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991). Therefore the record contains no references to the statute. Section 8 of the statute, now shown as a historical note to N.J.S.A. 2A:58C-1, made the Act fully applicable "to product liability actions filed on or after the date of enactment [July 22, 1987]." This complaint was filed September 14, 1987. The charge, given in January 1991, however, did not materially depart from the explanation of the law required by the Act. It was detailed, and the judge properly related it to the facts before him. The trial judge repeated his charge concerning warnings at least three times. We will only, quote from the principal reference. He correctly explained that in some situations a manufacturer may not be able to install a safety device. See Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 397-398, 451 A.2d 179 (1982). As was noted in Michalko, the judge here determined that Cincinnati owed a duty to plaintiff, notwithstanding the changes in the product since the aspect of the product that plaintiff claimed had injured him had not been *13 changed (the lack of a universal safety device). The judge submitted this design defect issue to the jury which resolved the issue in favor of the manufacturer.
It is the impracticability of the manufacturer's installation of a particular safety device before the manufacturer knows the use to which the press brake is to be put that heightens the manufacturer's duty to give proper and timely warnings. Thus the warning defect issue was central to this case. The judge charged:
[T]o the extent that [the manufacturer] has some ability to control the product through warnings or instructions, he has an obligation to, as reasonably as he can, provide such warnings or instructions about the dangers in the product because he has an obligation, as I've said, to make the product as safe as he can without impairing its basic utility.
He, therefore, must reduce the dangers of the product by warning of the danger or giving adequate instructions to its safe use when it later becomes apparent or when he should become aware that the product is no longer safe, and he has now the opportunity to issue adequate warnings or instructions at least to the extent that safety would have required him at the time of manufacture.
The law frankly is not that clear as to whether if he has an opportunity he has to update what the state of the art may be because of new technologies that have occurred between the time he manufactured and now when he encounters it, but certainly he has an obligation to try to make it as safe as he originally had the obligation to do and warn of those dangers when he sees that the machine has fallen out of a safe configuration. (emphasis supplied).
The judge then explained to the jury that the test was one of reasonableness and further explained what an adequate warning might have been; that is, a brochure, sign, picture, or whatever the jury might determine to have been reasonable under these circumstances. He continued:
[B]ut the obligation is that he must give an adequate and reasonable warning of the danger of which he now becomes aware that he had some obligation to at the time he originally manufactured it and [this must] be given in a reasonably effective manner.
The trial judge may have somewhat limited his charge when he referred to such information as may have been available at the *14 time of manufacture. Actually, the law requires more of a manufacturer. N.J.S.A. 2A:58C-4.
Since the jury found in defendant's favor on the design defect claim, the issue before us is not one of design defect. In a design defect case, there is no duty to anticipate a future state-of-the-art. N.J.S.A. 2A:58C-3a(1), governing only design defects, focuses on the state-of-the-art solely as it existed "[a]t the time the product left the control of the manufacturer." The issue before us, however, concerns the failure to warn, governed by N.J.S.A. 2A:58C-4. In this warning defect section, there is an implicit recognition of the Supreme Court's statement in Feldman v. Lederle Laboratories, Inc., 97 N.J. 429, 479 A.2d 374 (1984):
Although a manufacturer may not have actual or constructive knowledge of a danger so as to impose upon it the duty to warn, subsequently acquired knowledge, both actual and constructive, may also obligate the manufacturer to take reasonable steps to notify purchasers and consumers of the newly-discovered danger.
Id. at 456, 479 A.2d 374. Again, this obligation to warn must be distinguished from a manufacturer's obligation to make a physical correction to a defectively designed product. In Stephenson v. R.A. Jones & Co., Inc., 103 N.J. 194, 510 A.2d 1161 (1986), the court, citing Michalko, supra, 91 N.J. at 400, 451 A.2d 179, noted that a manufacturer may not rely upon a purchaser-employer to correct a subsequently discovered design defect in its product: "A manufacturer that knows its machines are defective has a duty to employees of the purchaser to correct the defect and may not rely on the purchaser-employer to make the necessary correction." 103 N.J. at 200, 510 A.2d 1161. The Stephenson Court held that a manufacturer could not discharge its responsibility by merely sending a warning letter and a new guard to be installed on the machine. Thus we see that there is a continuing duty (but only within the original state-of-the-art) to correct a design defect which existed when the machine was placed into the stream of commerce by a *15 manufacturer; but there is a different duty to warn of a danger concerning the product, irrespective of when the knowledge is or could have been acquired.[7]
The Legislature clearly adopted this distinction when it established an absolute state-of-the-art defense for design defect claims in N.J.S.A. 2A:58C-3a(1), but used contrary language when defining the failure to warn claim. N.J.S.A. 2A:58C-4 recognizes the continuing duty to warn concerning dangers discovered even after the manufacturer's shipment of a product by providing a limitation on such liability if the manufacturer later gives an adequate warning. The Act provides a defense to the claim described in Feldman by stating, inter alia:
In any product liability action the manufacturer or seller shall not be liable ... in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction.
N.J.S.A. 2A:58C-4. We note that there is no reference here to state-of-the-art or warnings of dangers not yet discoverable at the time the manufacturer shipped the product. When the dangers become known to the manufacturer, it must provide "an adequate warning or instruction" by whatever means are reasonable under the circumstances.
*16 The Products Liability Act also includes a standard against which to measure what is an "adequate warning or instruction." N.J.S.A. 2A:58C-4 states:
An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the products, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used.[8]
Notwithstanding the lack of reference to the Products Liability Act, the judge imparted the standard just quoted when he stated that the warning
must be in a reasonable location and in a reasonable form which will convey the appropriate type of information to the user or reasonable foreseeable user of such a product. They must advise such a person adequately or inform him adequately of the unsafe condition and the risk of harm being posed by the product.
While the statutory language was not used, we do not find a sufficient deviation from the import of the statute to question the charge in this respect. The earlier-quoted language from the charge might have mistakenly focused on the warnings concerning dangers discernable at the time of manufacture. However, under the facts of this case, the danger of operating the machine without a point of operation guard was not newly-discovered. Thus this deficiency in the charge was not material.
We realize that plaintiff's expert stated that the warning sign supplied by Cincinnati should have stated that the employee should not operate the machine without a point of operation guard, rather than an admonition that the machine should be used with a point of operation guard. The difference in these statements is minor, and liability should be based upon more than such a semantic difference in emphasis. Given the materials supplied by Cincinnati to East Atlantic in response to a simple request for an operations manual and a parts manual, *17 any determination on the part of the jury that Cincinnati violated its duty to warn by not using the precise language suggested by plaintiff's expert strains the legal standards just discussed. We do not hold that defendant's warnings were adequate as a matter of law. Butler v. PPG Industries Inc., 201 N.J. Super. 558, 562, 493 A.2d 619 (App.Div. 1985), certif. denied, 102 N.J. 298, 508 A.2d 186 (1985). But, proof of inadequacy was absent in this case, except for the semantical difference in the warning language just rejected.
We will therefore now focus upon any duties that may have arisen when Cincinnati's service representative visited the plant. Without other error, the parties contentions resolve to the issue of Remlinger's duty and actions when he paid his courtesy service call to East Atlantic. We have already discussed the operation manual, safety manual and ANSI standards, together with the safety signs left with plaintiff's employer which were in fact posted (one of the signs we are told was thought sufficiently informative as to cause the employer to have placed it on a different machine).[9] If Remlinger had the duty to inspect the press brake for safety defects and warn East Atlantic concerning them, then Cincinnati can be responsible for the breach of such a duty, because there clearly was no such inspection and report.[10]
*18 We reject defendant's claim that because major components of the machine had been replaced when Remlinger saw the machine, Cincinnati was absolved of responsibility to warn of a danger inherent in the machine as originally manufactured, irrespective of the replacements. Brown v. United States Stove Co., 98 N.J. 155, 167, 484 A.2d 1234 (1984); Solar v. Castmaster, 98 N.J. 137, 149, 484 A.2d 1225 (1984). The specific replacements either were irrelevant to this accident or could reasonably have been contemplated by defendant, as revealed by its own literature (referring to the clutch and foot treadle). With these changes the Cincinnati portion of the remaining machine could be thought of as a component part of the machine as it existed at the time of the accident. However, the manufacturer of even a component part may be liable for a design or warning defect. Michalko, supra, 91 N.J. at 395-399, 451 A.2d 179.
Remlinger at no time saw the machine in operation, nor was he told the particular operation that the machine was expected to perform. Additionally, there was no showing of when the shroud or guard had been broken off the electric foot pedal, nor even the location of the foot pedal when Remlinger examined the machine. Thus the proposition that Remlinger could have described a particular guard or safety device to LeoGrande which may have prevented plaintiff's accident, or even given advice that guards must always be used has no support in the record. Remlinger was apparently not trained as a safety expert, and he could not have been expected to have analyzed East Atlantic's operation and to have suggested a particular safety guard that might have prevented the plaintiff's accident. Further, there was no showing that Remlinger was present on the premises as a safety inspector for Cincinnati; nor a showing *19 that East Atlantic viewed Remlinger as a safety inspector and relied upon his analysis in continuing to fail to provide safety devices; nor that Remlinger assumed such responsibility by any act or deed. Thus, if Cincinnati discharged its duty to warn when it supplied the written materials, it cannot be said to have assumed a greater duty by sending this service representative to pay a courtesy call. See Lally v. Printing Machinery Sales & Service Co. Inc., supra, 240 N.J. Super. at 186-187, 572 A.2d 1187 (company providing maintenance service is not responsible for the absence of guards or failure to warn); Jackson v. New Jersey Mfg. Ins. Co., supra, 166 N.J. Super. at 456-460, 400 A.2d 81 (no liability imposed upon an insurer who inspected the premises for insurance purposes, but allegedly failed to warn concerning a safety defect). Although Remlinger was the representative of the manufacturer, his actions did not enhance the manufacturer's duty to warn if that duty had already been discharged. The jury's decision to the contrary must have been based upon a misunderstanding of the proofs, sympathy for plaintiff, or a like reason.
In sum, while the issue of an adequate warning is generally a matter for the jury to determine, we cannot find in this record a basis for the jury's determination that there was a failure to warn. Michalko recognizes the two-step duty of a manufacturer, namely to install a safety device if it can be installed; if it cannot, to warn the employer to install the device if possible, and to warn the employee of the danger. 91 N.J. at 402-403, 451 A.2d 179. The jury here found that the manufacturer was not required to install the device, and this record does not support a claim that Cincinnati failed to give appropriate written instructions once it knew of East Atlantic's ownership of the machine. The jury apparently could not reasonably have determined that these instructions were inadequate, applying the definition of N.J.S.A. 2A:58C-4, nor could it have found that Remlinger's visit to East Atlantic caused Cincinnati to assume *20 any greater duty to provide for plaintiff's safety.[11] An actionable failure to warn cannot be based upon supposition or conjecture by the jury.
Defendant, however, made no general motions for an involuntary dismissal, R. 4:37-2(b), judgment at the close of plaintiff's proofs or the entire trial, R. 4:40-1, or for a judgment notwithstanding the verdict, R. 4:40-2. Defendant did make one unsuccessful motion for judgment on the basis of a substantial change in the machine. The entire discussion concerning this motion involved the design defect aspect of the case, without a single mention of a failure to warn. (The duty to warn and the status of a failure to warn as a product liability claim was, however, discussed in detail at the argument of plaintiff's motion to be relieved from any claim of contributory negligence). Defendant's motion related solely to "the argument on substantial alteration," and the then codefendants joined in that motion. Defendant argued at one point that the entire product liability claim should be dismissed because of the perceived material alteration of the machine, but in context this argument did not appear to refer to plaintiff's warning defect claim.[12] The discussion of this motion, including the codefendants' efforts to be dismissed, encompassed eighteen pages of transcript. It focused solely on the alteration of the machine and the presence or absence of the universal guard proposed by *21 plaintiff's expert. The motion was granted as to the codefendant, but denied as to Cincinnati. The motion put before the trial judge contained no argument that plaintiff had failed to produce sufficient evidence that defendant had violated its duty to warn.
Furthermore, although defendant in its brief contends that on January 31, 1991 it "moved for a new trial or in the alternative a judgment notwithstanding the verdict," the actual notice of motion shows that it was limited to a new trial. The transcript of the argument on the motion confirms that defendant never specifically requested a judgment notwithstanding the verdict; the entire argument was for a new trial. R. 4:40-2(b) does deem such a motion to be included in a new trial motion, but this rule is limited to cases where a party has already moved for judgment and that motion has been denied.
Defendant did, however, move for a new trial. At that hearing, other than argue that the codefendants should not have been dismissed, defendant limited its argument to a lack of a duty to warn. The judge denied the motion and explained his factual basis: when Remlinger as defendant's "field representative" who had seen and worked with guards, saw the machine, "the jury I think at that point had a right to feel that he would recognize the absence of either a guard or a situation whereby there should be some warning for lack of a guard." We disagree. As we have noted, there was no such showing that Remlinger assumed any duty as a safety inspector, other than to post a warning sign or "tag." On the facts as presented in this trial, the jury could not impose a greater duty on defendant to warn.
Yet for two reasons we cannot simply enter judgment for defendant. First, the only motion made by defendant on this issue was for a new trial. Surkia v. Strelecki, 114 N.J. Super. 596, 599-601, 277 A.2d 888 (App.Div. 1971), certif. denied, 59 N.J. 266, 281 A.2d 528 (1971); Poland v. Parsekian, 81 N.J. Super. 395, 401-402, 195 A.2d 660 (App.Div. 1963); cf. Logan v. *22 North Brunswick Tp., 129 N.J. Super. 105, 109, 322 A.2d 467 (App.Div. 1974), certif. denied, 66 N.J. 328, 331 A.2d 28 (1974). See S. Pressler, Current N.J. Court Rules, R. 4:40-2 Comment (1991). A new trial is the sole relief sought by defendant and is appropriate under R. 4:49-1, since "it clearly and convincingly appears that there was a miscarriage of justice under the law." Second, the focus of the proofs was not on the issue we have discussed here and upon which the jury apparently decided the case. The testimony concerning the adequacy of the warnings was minimal, and defendant's appeal did not squarely meet the issue. Until we defined the problem, as we saw it, the parties did not address it, as they now have in their memoranda on reconsideration. A case of this magnitude should not turn on what the parties saw as a peripheral issue, without the parties' full recognition of the manufacturer's statutory duty under the new legislative directives and standards, and without arguments to the jury directed to this issue.
The sole issue at the new trial will be whether defendant failed to give adequate warnings. Since there may be new expert proof or other evidence presented concerning the written submissions of Mr. Remlinger's visit, possibly implicating his observations of the cover broken off of the foot pedal, the failure to warn claim may be based upon whatever evidence may be produced at the new trial. The design defect claim, however, has been definitely decided by the jury.
In view of the ample basis for the jury's finding of no actionable design defect; no claims that the codefendants had a duty to provide greater warnings than Cincinnati gave to East Atlantic; and no possible agency between the co-defendants and Remlinger, we need not treat the issue raised on defendant's appeal from the dismissal of its cross-claims. The claims against the co-defendants were properly dismissed since there were no independent bases for their liability to plaintiff which in turn could have supported defendant's cross-claims for contribution under the Joint Tortfeasors Contribution Act.
*23 The judgment in favor of plaintiff is reversed and the matter is remanded for a new trial. No costs shall be awarded on this appeal.
NOTES
[1] Cincinnati also cross-claimed against these defendants, but the remaining cross-claims were dismissed by the court at the close of all the evidence. The court found that Cincinnati's cross-claim against the codefendants did not implicate the sole theory upon which a design defect claim was presented, namely, that Cincinnati failed to design or construct the machine with a particular type of point of operation guard. Cincinnati also appeals from this ruling.
[2] East Atlantic's receipt of this "bulletin," the safety manual entitled "Press Brake Safeguarding," was questioned by plaintiff in the reconsideration motion. Plaintiff claims that LeoGrande could not remember whether he received the safety manual or not. Therefore, plaintiff now urges that the jury could have found that Cincinnati failed to provide East Atlantic with suitable warnings. We do not see this as an issue. The transmittal letter accompanied several items, only one of which, the safety manual (PI-30641), was specifically mentioned. It would be pure speculation for the jury to determine that this item was omitted.
[3] There are basically three types of safety guards. One, such as the originally-designed photoelectric guard, shuts off the machine if a beam of light is broken. This guard may readily be used if the material to be processed lies entirely within the bed of the machine. If, however, the material extends beyond the bed of the machine, the material itself would trigger such a guard which of necessity would have to be disconnected for the machine to function. Second, and similar to the photoelectric guard, would be a two-hand guard attached to the operator's wrists or the use of double buttons which must be pressed to insure that the operator's hands are not in the bed of the machine while it is operating. Again, while these guards often are used in a punch press operation which occurs in a narrow area, the broad areas of compression in this press brake and the operator's duties might make this type of guard also impractical. A third type of guard is one that does not shut off the machine, but presents a physical barrier between the operator and the point of operation. Again, depending upon the particular use of the machine, this type of guard may or may not be practical. Also, if the material being fabricated provides its own barrier, any type of guard might be unnecessary. For example if a piece of metal five feet in depth was being inserted into the machine to be formed or sheered at one end, and the operator holds the far end, the metal itself would form a barrier to prevent the operator from reaching into the machine.
[4] By way of editorial comment, we see that these problems so often arise out of a Workers' Compensation system that provides relatively inadequate recovery even when the employer's negligence is so extensive that it borders on wanton conduct. Provided it falls short of an "intentional wrong," the employee has no remedy against the employer apart from Workers' Compensation. N.J.S.A. 34:15-8. So many of these costly suits against equipment manufacturers could be forestalled if either the Workers' Compensation remedy were more realistic, the tort law compensation were more circumscribed, or if the common-law suit exception were expanded to permit indemnification claims against an employer by a third party which is found liable for less than some fixed percentage of liability.
[5] When the machine was originally sold, it had a manual clutch so that operator by means of a clutch lever could move the press into position rather than use the automatic cycling in operation at the time of the accident. However, this latter change could not be considered material, since defendant's own materials showed the use of automatic cycling as an optional feature. Furthermore, as noted earlier, the replacement of the foot treadle with an electric foot switch requiring only one to two pounds of pressure (as opposed to the 50 to 70 pounds of pressure needed to operate the treadle) also was shown as an optional method of activation.
[6] Remlinger's report noted that he had put safety tags on the machine. These "tags" were signs which noted danger, and specifically mentioned that a point of operation guard should be used. As the machine was not then being used, he did not inspect to see whether there was a point of operation guard or other safety device, or whether there were any safety defects. He noted nothing in his report regarding this aspect of the machine, since he claimed he was not there to do a safety inspection. In fact, the materials sent to or left with East Atlantic contained the names of safety inspection companies that could analyze the operation and suggest appropriate safety devices.
[7] Language to the contrary in Jackson v. New Jersey Mfg. Ins. Co., 166 N.J. Super. 448, 400 A.2d 81 (App.Div. 1979), certif. denied, 81 N.J. 330, 407 A.2d 1204 (1979), must be taken as implicitly overruled by the quoted language of the Supreme Court in Feldman. The court in Jackson hadstated:

There is no duty upon the seller of a machine faultlessly designed and manufactured ... to notify its customers after the time of sale of changes in the state of the art concerning the safe operation of such machine and advise them to install new, updated or improved safeguards developed since the time of sale.
166 N.J. Super. at 465, 400 A.2d 81. While this language difference was apparently overlooked in Bottignoli v. Ariens Co., 234 N.J. Super. 353, 560 A.2d 1261 (App.Div. 1989), which followed Jackson, we pointed out this distinction and questioned Bottignoli and Jackson in Lally v. Printing Machinery Sales & Service Co., Inc., 240 N.J. Super. 181, 185 n. 3, 572 A.2d 1187 (App.Div. 1990). The trial judge here relied on Stephenson, and rejected the limitation on liability described in Bottignoli.
[8] In the case of prescription drugs the standard is the prescribing physician's ordinary knowledge, rather than that of the user.
[9] Plaintiff argues in his memorandum in support of reconsideraunder Michalko Remlinger had a duty to post the three signs or tags on the machine. N.J.S.A. 2A:58C-4 does not require a manufacturer to place written warnings on a machine now owned by another, but only to provide "an adequate warning or instruction." Remlinger posted the "tags" by giving them to the owner of the machine, although the owner then placed only two of the three tags on the press brake and the third on another machine.
[10] Plaintiff argues in his brief that "[a]ccording to Mr. Cloutier [Cincinnati's Product Safety Coordinator], service representatives are trained to bring unsafe conditions (such as missing guards) to the attention of the supervisor at the user's facility." However, an examination of the testimony given by Mr. Cloutier reveals no such statement. The witness did testify that "whether they're [referring to the machine's owner] safeguarding there or not or whether there's a dangerous or unsafe situation are two separate situations." If a machine must be operated at times without a point of operation guard, then the machine may not necessarily be in an unsafe condition if it is seen without a point of operation guard.
[11] Had there been some showing that the elimination of the cover on the brake pedal had occurred prior to his visit there might have been some shred of evidence which might have implied a duty to speak. The record, however, is silent on this point.
[12] On defendant's motion for reconsideration it urged that it had moved for judgment on the issue of the sufficiency of the warning. In the midst of its argument that it had no duty to warn because of the material alterations, defendant's attorney stated that "plaintiff's claim of product liability should be dismissed" based on the 1966 conduct (the design defect claim) and the 1986 conduct (presumably the lack of a duty to warn). After our rereading the arguments of all of the motions for judgment and a new trial, it appears that the issue we here find dispositive was never specifically argued to the trial judge.