258 N.J. Super. 261 (1992)
609 A.2d 487
VICTOR FABIAN, PLAINTIFF-APPELLANT,
v.
THE MINSTER MACHINE COMPANY, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted June 3, 1992.
Decided July 1, 1992.
*266 Before Judges KING, DREIER and BROCHIN.
Francis X. Dorrity, attorney for appellant (Francis X. Dorrity, on the brief).
*267 Hoagland, Longo, Oropollo & Moran, attorneys for respondent (Michael B. Oropollo and Catherine Cookson, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff, Victor Fabian, appeals from a dismissal of his complaint after a jury verdict for defendant, and the denial of his motion for a new trial. Plaintiff was employed as a power press operator on March 11, 1988 when his hand was crushed by a press manufactured by defendant, the Minster Machine Company, Inc. In this products liability action, governed by N.J.S.A. 2A:58C-1 et seq., plaintiff claimed that the machine, manufactured in 1968, was defective because as designed, (a) it lacked guards and other safety devices, and (b) it lacked adequate warnings.
Plaintiff had worked for several months as a power press (or punch press) operator at C & C Metals. The power press stamps out metal products using interchangeable dies. On the morning of the accident, plaintiff started up the press as usual by turning on the motor, and activated the ram by simultaneously pressing two black palm buttons placed 24 inches apart on the front. A metal strip had been fed into the machine, and the press was set on continuous run. After activation, the machine successfully stamped out the product for two hours. At mid-morning break, plaintiff stopped the run by pressing one of the middle palm buttons (red or yellow) on the front.
After the break, plaintiff restarted the ram with the two black buttons. Within a few minutes there was a misfeed, so plaintiff stopped the run by pressing one of the middle buttons. He turned off the air blower, which blows finished pieces to the back, cut the metal feeding strip, and freed the metal scrap from the die with his hands. In order to refeed, he went to the side of the machine and switched the controls from continuous to "inch" mode. This was necessary because the metal strip *268 feeds from the right, and until it reaches the roller on the left, it must be advanced by hand. In inch mode, the ram comes down slowly an inch at a time, and goes back up an inch at a time, but supposedly only so long as both black buttons are continuously being pressed. After a couple of good pieces, the ram stopped at the top with the next piece stuck in the upper die. According to plaintiff, with his left hand at his side, he was reaching with his right hand to pull out the stuck piece, when the ram came down and crushed his upturned hand.
Immediately after the accident plant manager Richard Peterson determined that the ram was in the inch mode on the way down. He and others switched the machine from the inch mode and put a bar in the fly wheel in order to keep the ram from advancing any further on plaintiff's hand. After about half an hour, they succeeded in releasing plaintiff from the press. Peterson was unable to find anything wrong with the machine afterwards, and did not repair it before putting it back into production.
The press, which defendant acknowledged was a Minster No. 5 general purpose punch press built in 1968, was purchased by a predecessor of plaintiff's employer in 1971. Peterson himself ordered it, along with a bolster plate. The operator's manual came with it, but the pressroom foreman who orally instructed plaintiff on the machine's use, never saw that manual. The press bore no warning or safety signs.
According to plaintiff's expert, mechanical engineer Louis Howarth, the machine was defective when sold because it lacked guarding at the point of operation and because it lacked warning or accident prevention signs. He believed that one or both of those defects must have been the cause of the accident. According to Howarth, the machine should have been equipped with guards that made it impossible to hold one's hand under the ram when it descended. The applicable voluntary safety code required a safety device or guard for punch presses in 1968. The industry standard for punch presses, numbered B-11.1, *269 was published by the American National Standards Institute (ANSI), known in 1968 as the American Standards Institute (ASA). The point of operation device or guard recommended by ASA was intended to prevent the very accident that occurred, that is, the closing of the ram on a hand.[1]
Plaintiff's expert Howarth admitted in cross-examination that the two-hand palm button activator was itself a point of operation device (not guard) in satisfaction of the ASA code. The two-hand activator requires that two buttons, spaced 24 inches apart, be pushed simultaneously and continuously in order to operate the press in the inch mode. In fact, in a prior case, Howarth had testified that the two-hand trip was the best universal point of operation device available. He also admitted that the guards he had cited in this case had to be disengaged when manual access to the point of operation was deliberately sought, as was the case here. He additionally conceded that a safety block is effective only for gravity falls of the ram, not for the power descent that occurred here.
According to Howarth, the machine also should have borne warning signs or safe operation instructions. The only metal labels riveted to the machine pertained to lubrication instructions and component part specifications; neither was directed to the operator. The absence of warnings violated ASA standard Z-35.1, which provided a standard format for warning signs. Howarth admitted on cross-examination, however, that the ASA code did not require warning signs on punch presses, but *270 simply prescribed a uniform standard for the form of warning signs in general.
Howarth could not explain how the ram was suddenly activated while in the inch mode, or what caused it to descend as it did, and he had been unable to duplicate the unwanted, "repeat" stroke, or "double strike" in later testing. Significantly, he could not say that it was the design of the machine that had caused the unwanted stroke.
According to defendant's expert, engineering consultant William Eaton, in 1968 the press was reasonably fit, suitable and safe for the purpose for which it was designed (with the two-hand safety device), and this was not a foreseeable accident. Eaton stated that the press is a general purpose component machine, not a self-contained manufacturing unit, and has no point of operation to be guarded until tooling and feeding devices are added. Therefore, according to Eaton none of the point of operation safeguarding proposed by plaintiff's expert could possibly have been installed by defendant. He testified that because a safety guard, which prevents access to the point of operation at all times, was not feasible, a safety device, which prevents access on the stroke, was the best measure that defendant could have taken.
According to Eaton, the point of operation was so obviously dangerous to flesh that no verbal warning was needed to caution against allowing the ram to be operational while a hand was under it. Furthermore, plaintiff admitted in deposition that he recognized the danger as he was reaching into the machine. Eaton concluded that the accident was unforeseeable because, as designed by defendant, the machine could not have produced the unwanted stroke absent catastrophic failure, which it is conceded did not occur. The cause of the accident remains unknown.
Plaintiff contends that the jury instructions on the risk/utility analysis and the state-of-the-art defense were erroneous because they placed on him an improper burden of proof to *271 show that the press's dangers outweighed its usefulness. He also contends that the state-of-the-art defense is unavailable where the claim is failure to warn.
Correct jury charges are essential to a fair trial. State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). In a products liability case, it is especially important to tailor the instructions to the factual situation. Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 176, 406 A.2d 140 (1979). Here the judge charged that defendant had a duty to market a product "reasonably safe for its intended or reasonably foreseeable purposes." See N.J.S.A. 2A:58C-2. He presented state-of-the-art as merely a factor to be considered in the overall risk/utility analysis. Plaintiff timely objected to the charge on state-of-the-art. While we find this charge erroneous, the error was clearly harmless. R. 2:10-2.
This claim is governed by the Products Liability Act, effective July 22, 1987. N.J.S.A. 2A:58C-1 et seq. The Act was "not intended to codify all issues relating to product liability, but only to deal with matters that require[d] clarification." N.J.S.A. 2A:58C-1a. It "leaves unchanged the three theories under which a manufacturer or seller may be held strictly liable for harm caused by a product  defective manufacture, defective design, and defective warnings...." Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 94-95, 577 A.2d 1239 (1990); N.J.S.A. 2A:58C-2. However, it redefined some defenses. It converted into absolute affirmative defenses what had been under the common law merely factors in the overall risk/utility analysis. Dewey v. R.J. Reynolds, 121 N.J. at 96, 577 A.2d 1239. Specifically, it created as absolute defenses a state-of-the-art defense, N.J.S.A. 2A:58C-3a(1); an obvious-danger/consumer-expectations defense, N.J.S.A. 2A:58C-3a(2); and an unavoidably unsafe defense, N.J.S.A. 2A:58C-3a(3). But these defenses were not intended to alter existing rules on the burden of proof. N.J.S.A. 2A:58C-3c. The Act has not appreciably altered the common law interpretation of risk/utility *272 analysis outside of the three absolute defenses. The risk/utility factors enumerated in this jury charge followed closely the factors recognized by our courts since Cepeda v. Cumberland Eng'g Co., Inc., 76 N.J. 152, 174, 386 A.2d 816 (1978), and repeatedly cited. See e.g., Johansen v. Makita USA, Inc., 128 N.J. 86, 96-97, 607 A.2d 637 (1992).
The only applicable statutory defense here might have been the state-of-the-art defense, which provides:
In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:
(1) At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product....
N.J.S.A. 2A:58C-3a(1). However, the judge charged the jury as follows concerning the risk/utility analysis (including state-of-the-art):
In determining whether plaintiff has shown that the dangers of a product outweigh the usefulness and, hence, that a reasonably careful manufacturer, seller or distributor would not have manufactured, sold or distributed the product at all in the form it was manufactured, sold and distributed, you are, in effect, being asked to determine whether, assuming knowledge of the harmful propensity of the product, the defendant Minster Machine acted in a reasonably prudent manner in marketing, selling or distributing the product. In order to make this determination you must consider the following factors:
[The judge then reviewed four of the relevant risk/utility factors].
Although this type of evidence is relevant and should be considered by you, the defendant's compliance with technology and scientific knowledge as of the date of the manufacture, sale or distribution and the common practice and standards of the industry does not constitute an absolute defense for marketing that product.
Where as here the defendant has argued that compliance with technology and scientific knowledge as of the date of manufacture justifies placing the product on the market, the burden is on the defendant to prove compliance with state of the art knowledge and that it was justified in placing the product on the market.

Such compliance does not mean the product is safe. A product may embody state of the art and yet still be defective should you find that its risk outweighs its usefulness. That is, a reasonably prudent manufacturer, seller or distributer with knowledge of the product's harmful propensities would not *273 have marketed, sold or distributed it. However, the defendant's compliance with state of the art may, along with other evidence relevant to this analysis, satisfy you that the product was properly marketed, sold or distributed.

Therefore, whereas here the plaintiff claims the product's risk outweighs its usefulness, considering the defendant's legally presumed knowledge of the product's potential to cause harm, you should determine whether the product was defective in that its danger outweighs its benefits and, therefore, a reasonably prudent manufacturer, seller or distributor would not have marketed, sold or distributed it.
(emphasis added).
To the extent that the charge generally indicated that it was plaintiff's burden to show that risk outweighed utility, the charge was correct. Under the Products Liability Act, as under common law, it is plaintiff's burden to prove "that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose...." N.J.S.A. 2A:58C-2. While this language departs slightly from the Supreme Court's recitation of the test in Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 169,[2] 406 A.2d 140 the Supreme Court in Dewey v. R.J. Reynolds Tobacco Co., supra, confirmed that no doctrinal change was intended. 121 N.J. at 94-95, 577 A.2d 1239. Reasonableness is properly tested here under a risk/utility analysis.
The standard is basically the same as in a negligence case. Whether the defect is in the design or due to a lack of warning, unless an absolute defense is interposed, reasonableness is the prime factor in determining liability.
The question in strict liability design-defect and warning cases is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or in providing the warnings given.
Feldman v. Lederle Laboratories, 97 N.J. 429, 451, 479 A.2d 374 (1984). Here the judge also correctly emphasized that knowledge of the product's dangers should be imputed to *274 defendant. Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 239, 432 A.2d 925 (1981).
Plaintiff further argues that the state-of-the-art defense charge failed to place on defendant the burden of proof to show "that safety guards and warnings were not commonly utilized when the punch press was manufactured in 1968."
We perceive two errors in this charge. First, the judge expressly placed the burden to prove compliance with state-of-the-art knowledge on the defendant. (See the first emphasized portion of the state-of-the-art charge, quoted above). The burden on a defendant who claims a state-of-the-art defense is to prove only the technological state-of-the-art when the product was manufactured. Feldman v. Lederle Laboratories, 97 N.J. 429, 455-556, 479 A.2d 374 (1984) ("[T]he defendant should properly bear the burden of proving that the information was not reasonably available or obtainable and that it therefore lacked actual or constructive knowledge of the defect.") The defendant had no burden to prove its conformity with the state-of-the-art. It remains plaintiff's burden, unaffected by the Product Liability Act, to prove non-conformity. See N.J.S.A. 2A:58C-3c. Second, this charge was erroneous in that, by including the state-of-the-art element only as an element of the risk/utility analysis, the court failed to give defendant the benefit of the absolute statutory affirmative defense available under N.J.S.A. 2A:58C-3a(1) for design defect claims. However, these errors prejudiced defendant, not plaintiff.
Plaintiff also argues that the state-of-the-art defense is unavailable for a failure-to-warn claim. His argument is based on Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 204, 447 A.2d 539 (1982), which disallowed the state-of-the-art defense against an asbestos manufacturer where the alleged defect was failure to warn.[3] Under the Act, the state-of-the-art *275 absolute defense is expressly provided for all claims based on design defects. N.J.S.A. 2A:58C-3a(1). However, when a jury determines a failure to warn claim under N.J.S.A. 2A:58C-4 and thus assesses the overall reasonableness of the defendant's conduct, state-of-the-art is but one factor to be considered. See Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J. Super. 1, 15-16, 606 A.2d 378 (App.Div. 1992).
Here, on plaintiff's design defect claim, the statutory absolute defense would have been available, and on his failure to warn claim, state-of-the-art would have been a relevant factor to be considered. However, no one contested the fact that all of the suggested safety devices were technologically feasible and well-known when the machine was manufactured in 1966. Thus state-of-the-art should not have been in issue. We therefore find no harmful error in the jury instructions concerning the risk/utility analysis and the state-of-the-art defense. Defendant had a duty to provide an adequate warning, and the jury was so informed. Since no warning was given, the issue became one of proximate cause, discussed infra.
Plaintiff next contends that the judge erred in failing to instruct the jury expressly that defendant's duty to sell a product fit, suitable and safe for its intended purpose was not delegable in light of defendant's alleged argument that its duty was delegable to plaintiff's employer. Defendant responds that it did not argue that its duty was delegable, but only that it satisfied its duty. At the close of the judge's charge to the jury, plaintiff requested an instruction on non-delegability. The judge refused, saying that it was unnecessary because he had made it abundantly clear that the duty belonged to the manufacturer.
It is not disputed that defendant's duty was not delegable to plaintiff's employer. A manufacturer cannot delegate its *276 duty to provide safety devices or warnings to a down-stream purchaser. See Lally v. Printing Mach. Sales, 240 N.J. Super. 181, 184, 572 A.2d 1187 (App.Div. 1990), and the cases there cited. The judge emphasized throughout his charge that defendant had a duty not to sell a defective product.[4] Nowhere did his jury instructions imply that defendant could have delegated this duty.
Moreover, defendant did not, as plaintiff contends, attempt to shift responsibility to plaintiff's employer. Plaintiff cites testimony of defendant's expert that point of operation guards were not needed and could not be installed before tooling because point of operation is created only by the tooling and feeding devices. Cf. Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J. Super. at 8, n. 3, 606 A.2d 378. This testimony was offered, however, not to show delegation of duty, but to show that the two-hand trip device was the best safety device possible for the machine as it was when it left defendant's control. Defense counsel argued this in summation.
Even if defendant had tried to shift responsibility to the employer and claimed that the employer's conduct was the sole proximate cause of the accident, such an "empty chair defense" is not improper. See Brown v. United States Stove Co., 98 N.J. 155, 171, 484 A.2d 1234 (1984). This defense, actually a *277 claim that the defendant's conduct was not a substantial contributing factor to the accident, merely focuses the jury's attention upon the plaintiff's duty to prove that defendant's conduct or defective product was a proximate cause of the accident.[5] It shifts causal blame to another who is not legally liable in the suit. It may be the employee, a fellow employee or a defendant who has already settled. It may even be the plaintiff who is protected by the Suter doctrine of employee non-liability for comparative fault. See Johansen v. Makita USA, Inc., 128 N.J. at 103, 607 A.2d 637.
Plaintiff cites testimony elicited by defendant on repairs and maintenance of the press. This evidence was offered, not to show delegation of duty, but both to dispute proximate cause and to suggest that some agency other than defendant may have been responsible for whatever caused the ram to activate. These were both proper bases for admission of the evidence. Defense counsel argued in summation that there was no indication that the machine's ram had made any other unexplained repeat stroke at any time before or since the accident. Plaintiff also cites testimony elicited by defendant that the die setters, not plaintiff, had the responsibility to clear the misfeed and that plaintiff was not trained on the machine.
Plaintiff contends that evidence of the press's open and obvious danger and plaintiff's subjective knowledge of the danger, conduct and training were improperly admitted over his objection because the evidence implied that plaintiff recognized the danger and that his conduct caused the injury. It is *278 undisputed that defendant's defenses of contributory and comparative negligence were properly stricken on the first day of trial. See Johansen v. Makita USA, Inc., 128 N.J. at 98, 607 A.2d 637; Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 167-168, 406 A.2d 140. Neither contributory nor comparative negligence is applicable where an employee is injured at a workplace task. Ibid.; see also Green v. Sterling Extruder Corp., 95 N.J. 263, 270-272, 471 A.2d 15 (1984); Tirrell v. Navistar Int'l, Inc., 248 N.J. Super. 390, 401-402, 591 A.2d 643 (App.Div. 1991), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991); Ramos v. Silent Hoist & Crane Co., 256 N.J. Super. 467, 478-481, 607 A.2d 667 (App.Div. 1992). Such evidence, however, may be admissible on the issue of proximate cause. Cf. Johansen v. Makita USA, Inc., 128 N.J. at 102-103, 607 A.2d 637; Ramos v. Silent Hoist & Crane Co., 256 N.J. Super. at 483-484, 607 A.2d 667.
One application of this principle is defendant's claim that even if it breached its duty to warn, such a breach could not have been a proximate cause of the accident if the warning would not have been heeded. Over plaintiff's objection, defendant read into evidence excerpts from plaintiff's deposition showing both that the danger was obvious, and that plaintiff was aware of it at the moment of the accident:
QUESTION: My question is simply this that I'm asking you, when you were in front of that machine and you saw it come down on the piece of metal and crush the piece of metal and go up, did you realize that if it came down on your hand your hand was going to get hurt?
ANSWER: Yes.
QUESTION: Now if you don't shut the machine off you know it's dangerous to even go anywhere near that die, don't you?
ANSWER: Yes.
QUESTION: You did not  you didn't need a sign to tell you that it was dangerous, did you?
ANSWER: No.
Defendant's expert opined that no warning was needed because the press presented an open and obvious danger. Under our common law, the obviousness of a danger is but one factor to be considered in analyzing defendant's duty to *279 warn. Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 207, 485 A.2d 305 (1984). The Act combined the consumer expectations doctrine with the obvious danger factor of the risk/utility analysis, and thereby raised "obvious danger" to the status of an absolute defense in design defect cases, except in accidents involving industrial machinery. Dewey v. R.J. Reynolds Tobacco Co., supra, 121 N.J. at 96-97, 577 A.2d 1239. But although the statutory defense is expressly unavailable as an absolute defense for industrial machinery under the design defect section of the Act, N.J.S.A. 2A:58C-3a(2), a different rule pertains in a failure to warn case. Nothing in the Act or case law suggests that the obviousness of danger may not be considered as a factor to establish what is an "adequate warning" under N.J.S.A. 2A:58C-4, or whether a breach of that duty could be a proximate cause of the accident. Of course, in the same manner as a protective device, a warning sign is provided to protect the inattentive worker. For that reason, the plaintiff's lack of attention is not an answer to the failure to post a warning sign.
Properly posted signs may be an important indication that a duty to warn was discharged. Seeley v. Cincinnati Shaper Co., Ltd., supra, 256 N.J. Super. at 17, 606 A.2d 378. However, if there is an absence of signs, defendant must come forward with some indication that the sign would not have been heeded, since there is a presumption that the missing warning, if given, would have been followed. See Campos v. Firestone Tire & Rubber Co., 98 N.J. at 211, 485 A.2d 305 (1984) (citing Professor Twerski, who noted that several courts had "helped plaintiffs overcome the burden of proof by positing a rebuttable presumption that the warning would have been heeded if given").
Defendant did elicit evidence of plaintiff's sparse training, his conduct and his subjective knowledge of the press's danger. This, however, was within the scope of the direct examination, the subject having been raised there. Admission of such testimony, *280 where the area was opened by plaintiff, cannot be a basis for reversible error. Skripek v. Bergamo, 200 N.J. Super. 620, 632, 491 A.2d 1336 (App.Div. 1985), certif. denied, 102 N.J. 303, 508 A.2d 189 (1985).
Preexisting knowledge of danger, if subjectively recalled at the very moment of the accident, can negate a claim that absence of a warning was a proximate cause of the injury. Compare Campos v. Firestone Tire & Rubber Co., supra, 98 N.J. at 209, 485 A.2d 305, with Vallillo v. Muskin Corp., 212 N.J. Super. 155, 161, 514 A.2d 528 (App.Div. 1986), certif. denied, 111 N.J. 624, 546 A.2d 540 (1988). In Campos, plaintiff's earlier knowledge of the protection to be afforded by the wire cage as the tire was being inflated might have been brought to mind by an appropriate warning sign had it been posted. In Vallillo, the plaintiff was aware of the danger of an injury at the moment he dove into the shallow pool; thus a warning sign would have added little to change his conduct.
This evidence went to the issue of proximate cause, not comparative fault. The judge carefully cautioned the jury in his charge that the propriety of plaintiff's conduct was not to be questioned:
In such a case a defendant as a matter of law cannot raise a question relating to Mr. Fabian's conduct because this accident occurred in an industrial type setting and the law, therefore, does not permit the question of Mr. Fabian's conduct to even be questioned, it is not available to the defendant in this type of setting.
So please keep that in mind as you listen to what I have to say regarding the liability phase of this trial, and I'm now going to commence to charge you with respect to the question of product liability.
Here, plaintiff's own appreciation of the danger as he reached into the machine was clear from his testimony quoted earlier. The jury could appropriately have determined that even a properly-worded warning sign would have added nothing to the plaintiff's immediate appreciation of the danger.
Defendant's expert also opined that the accident could not have occurred as it was described by plaintiff:

*281 QUESTION: Can this accident have  can this accident have occurred as described  can you give an opinion as to whether this accident can occur as described based upon the design of the Minster press, and is that opinion based upon reasonable engineering probability?
ANSWER: I do have an opinion and it is based upon reasonable engineering probabilities.
QUESTION: What is that opinion?
ANSWER: The opinion is that it could not, a power stroke cannot take place except if both buttons were actuated and held actuated. In the inch mode in order to keep the ram descending you have to maintain actuation on both palm buttons continuously.
Without objection, the plant foreman testified that plaintiff while in the hospital explained that he had been pushing one of the black buttons while his hand was in the die. On cross-examination, plaintiff denied this. Thus there was a clear issue regarding how the accident actually occurred. If only one button was pressed, and the machine activated with plaintiff's other hand in the machine, something must have been changed to override the two-button control.[6] Testimony of plaintiff's perceptions and conduct, was therefore also relevant to causation; that is how the injury actually happened, and how it technically could have happened. Based upon ample support in the record, the jury resolved the liability issues against plaintiff.
Affirmed.
NOTES
[1] Feasible guards would have been a wire frame barrier guard, an electronic shut-off, a gate barrier guard or a safety block (mechanical stop). Interlock devices could be used in conjunction with some of these to prevent operation of the ram unless the guard was in proper protective position. Of course, the press as manufactured was functional only when dies were installed on the ram and bolster plate. The press as manufactured, without the dies, had no point of operation because the ram could not meet the bolster plate without them. However, barrier guards, electronic guards and interlocked gate barrier guards would all allow the press to function with the dies attached. Other companies offered optional point of operation guards on general purpose punch presses at the time that this press was manufactured.
[2] The two variations are the statute's omission of Suter's extension to reasonably foreseeable purposes, and the use of the word "and" in the phrase: "fit, suitable and safe."
[3] This holding has long since been limited to the facts of Beshada, that is, to asbestos cases. Landrigan v. The Celotex Corp., 127 N.J. 404, 425-426, 605 A.2d 1079 (1992); Feldman v. Lederle Laboratories, 97 N.J. at 455, 479 A.2d 374; O'Brien v. Muskin Corp., 94 N.J. 169, 183-184, 463 A.2d 298 (1983).
[4] For example he charged: "[a] manufacturer, seller or supplier of a product has an obligation to market or distribute a product which is reasonably safe for its intended or reasonably foreseeable purposes;" "[a] manufacturer, supplier or seller will be held liable if plaintiff proves ... the product as designed, manufactured and sold was defective ... [and] the defect existed when it left the hands and control of the defendant;" "a reasonably careful manufacturer or supplier would not have sold the product at all in the form in which it was sold;" "the critical question for you to decide is whether, assuming the defendant knew or should have known of the defect in the product, it nevertheless acted in a reasonably prudent manner in marketing, selling and distributing the power press;" and "[s]o long as the defect existed when the product left the hands of the defendant Minster machine, the plaintiff is not required to prove more." There are many more examples cited in defendant's brief.
[5] Navaro v. George Koch & Sons, 211 N.J. Super. 558, 572-573, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986), and Butler v. PPG Industries, Inc., 201 N.J. Super. 558, 564, 493 A.2d 619 (App.Div.), certif. denied, 102 N.J. 298, 508 A.2d 186 (1985), assert that the burden of proof of proximate cause shifts to defendant in such cases, citing Brown. While the burden of coming forward with some evidence to support the "empty chair defense" may be on the defendant, we see nothing in Brown to show that the normal burden of persuasion shifts from the plaintiff.
[6] Plaintiff here could not fall back on the argument that the machine must have been defective when distributed because it cycled with only one button pressed. Cases such as Moraca v. Ford Motor Co., 66 N.J. 454, 458-460, 332 A.2d 599 (1975), are applicable only where a plaintiff can negate all factors other than those for which the manufacturer would be responsible. Here, the age of the machine and its care and control by others precluded such a theory.